**AFFIRM; and Opinion Filed March 4, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-01084-CR

**ANDRE DJUNA HUBERT, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-60671-M**

## OPINION

Before Justices Bridges, Fillmore, and Lewis
Opinion by Justice Fillmore

Andre Djuna Hubert was convicted of murder. Hubert pleaded true to an enhancement paragraph of the indictment, and the jury assessed punishment of forty-five years' imprisonment. Hubert raises six points of error on appeal. In his first four points of error, he asserts he is entitled to a new punishment trial because the State mistakenly indicated to the jury that he was previously convicted of aggravated robbery and drug trafficking, and he is entitled to findings of fact and conclusions of law relating to those points of error. In his fifth and sixth points of error, Hubert contends the trial court erred by instructing the jury that he could receive good conduct credit prior to serving one-half of his sentence, and the evidence was insufficient to establish he intentionally shot the victim. We affirm the trial court's judgment.

**Background**

On October 3, 2011, Hubert shot Nicholas "H" Hosey. Hosey died several hours later on the morning of October 4, 2011. Hubert was indicted for murder.

At trial, Dallas County medical examiner Chester Gwin testified Hosey was shot at 11:45 p.m. on October 3, 2011. Hosey lived for several hours after being shot and was pronounced dead at 6:36 a.m. on October 4, 2011. The autopsy report indicated Hosey was shot in the back and the bullet exited through his chest, the cause of death was the gunshot wound to the back, and the manner of death was homicide. Gwin testified that a firearm is a deadly weapon and shooting someone with a firearm can cause serious bodily injury and is clearly dangerous to human life. According to Gwin, if a person with his chest to the ground was shot in the back by a person standing above him, the bullet trajectory could be the same as the trajectory of the bullet through Hosey. He also testified that a person laying on the ground and holding the ankles of the person firing the gun could have sustained the gunshot wound that killed Hosey.

Crystal "Breezy" Alexander testified that Hubert was her boyfriend in September and October of 2011. At that time, she was a crack addict. She had received money in settlement of a personal injury matter, and Hubert's gun was purchased with the proceeds from the settlement "to keep them from being robbed." The remainder of the settlement was spent on crack cocaine. In October 2011, she and Hubert lived in her car.

"The Cut" is an area where several auto mechanic shops are located on Harry Hines Boulevard in Dallas, Texas. Alexander testified this was an area where people "hang out," use drugs, including crack cocaine, and engage in prostitution and other crimes. She had been to The Cut a couple of times with Hubert. While at The Cut, Hubert would converse with Hosey, Gilbert Smith, and Marcel Antoine "Big Baby" Lugen. Alexander testified she was at The Cut on October 3 and 4, 2011.

According to Alexander, early in the morning of October 3, 2011, she found a cell phone in a parking lot. She offered to sell the phone to Smith for $20. Smith was working on Hosey's car at the time and Smith told Alexander that once he finished working on the car and received payment for the repair work from Hosey, he would pay Alexander for the phone. Alexander allowed Smith to keep the cell phone because she believed he would eventually pay her for it. However, Hosey "paid" Smith for the work on his car with crack cocaine instead of cash, and Smith smoked the crack cocaine. According to Alexander, although her agreement to sell the cell phone was with Smith, Hosey got "wrapped up in it" because Smith was to pay Alexander for the phone when Hosey paid him for the repair work on his car.

It upset Hubert that Alexander was not paid right away for the phone. Hubert was also upset because Hosey and Smith were "blowing us off" throughout the day regarding payment for the phone, either by not answering their phones when Hubert and Alexander telephoned them or by answering and saying "not right now." Alexander testified she spoke by phone with Hosey a couple of times on the day of the offense. In the last phone conversation, Hosey told her and Hubert, "Go on and meet me so we can handle this 'cause I am tired of dealing with y'all." Hours after that conversation, Hubert and Alexander were still trying to reach Smith by phone. Hubert was becoming increasingly upset because he was not getting "his" money for the cell phone.

Alexander and Hubert drove to The Cut to meet Hosey. Alexander believed they were going there to get the cell phone, money for the cell phone, or crack cocaine. Hubert had a silver .357 Magnum handgun with him. He was upset and yelling at Alexander, blaming her for giving the cell phone to Smith without getting the cash. Alexander testified Hubert never told her he was going to The Cut to shoot Hosey. Hubert parked Alexander's car in the back of The Cut and got out of the car with his gun. Lugen yelled down the alley, "They are here. Tell Hosey they

–3–

are here." Alexander told Hubert, "We don't need to do this. We need to turn around. Something is not right." Alexander stayed in her car. Hubert went into a shop where some Hispanic males were sitting, and she saw him showing the gun to the men. Alexander thought Hubert was trying to sell the gun to them. At the time of the shooting, she and Hubert needed money and had talked about selling the gun.

Alexander got out of the car to get something to wipe her face. James Alexander "Ghost Face" McCoy approached Alexander and asked if she or Hubert had any money on them. She told him to talk to "her man" and pointed to Hubert. McCoy then talked to Hubert, and she saw them walking away further down into the dark alley, and she lost sight of them. Two men then approached her and started beating her. While that was happening, she heard a gunshot, and the men who were attacking her ran away.

Alexander then saw Hubert walking back. He told her to get in the car. As he was getting into the car, Hubert set the gun on his lap. He was acting panicked and was breathing hard and shaking. His knee, elbow, and hand were scraped, blood was running down his leg, and Alexander saw bruises. Hubert said, "It was self-defense, it was self-defense, Crystal. I shot H[osey]." Hubert told Alexander that when he went "back there," McCoy, Lugen, Smith, and Hosey were together, and they circled around him. Hubert told her that he and Hosey started fighting, and as he got on top of Hosey, he fired his gun. Hubert told Alexander that "he got jumped," but did not say anything about anyone being robbed. Hubert drove away very fast.

According to Alexander, Hubert stopped by his father's apartment and told him what had happened. Alexander later drove to a friend's house in Oak Cliff and stayed there for about a day and a half. Hubert was arrested six to nine days later. Alexander was with him when he was arrested; they were living in her car.

–4–

Lugen testified at trial. At the time of trial, he was incarcerated for convictions in 2011 for unauthorized use of a motor vehicle and theft. He testified his criminal history went back to 1998, with convictions for robbery, burglaries, and theft.

Lugen testified Hosey was a close friend he had known since 2009. Hosey had lost his job driving a truck, and he resorted to selling drugs. Lugen met Hosey through drug transactions. Hosey would come to The Cut to do mechanic work. Lugen had known Smith for a while and looked out for him as a friend. He did not know McCoy personally. Hubert would come through The Cut occasionally in the year and a half before the shooting.

The morning of October 3, 2011, Lugen saw Hubert sleeping in the passenger side of Alexander's car parked in an alley of The Cut. Lugen had a conversation with Alexander who was trying to sell a cell phone for "like fifty bucks." About an hour later, Lugen had a conversation with Hubert because Lugen wanted "to get a hit" from Hubert. Lugen saw Alexander give the cell phone to Smith. Smith told Alexander he was going to buy the phone, but Smith then "went around" trying to sell the cell phone for fifty dollars. No one would buy the cell phone because it was a type of phone that was normally sold for twenty to twenty-five dollars. Hosey had given Smith some crack cocaine. The cocaine was in payment for the repair Smith made to Hosey's van. Hosey never had possession of the cell phone; Smith traded the cell phone to another drug dealer for some crack cocaine.

According to Lugen, Hubert and Alexander came to The Cut four to five times that day and were asking about payment for the phone. Around 8:00 p.m., Hubert drove into The Cut, stopped, jumped out of the vehicle with a gun in his hand, and walked to the backside of The Cut where Hosey normally parked. Hubert did not locate Hosey's car there. Hubert got back into Alexander's car and drove away. Hosey was across the street from The Cut. Lugen went to warn him that Hubert "is looking for you with a pistol." Hosey told Lugen that Hubert had just

–5–

called him on the phone and told Hosey to meet him in the alley of The Cut, because he wanted to "buy something from me." McCoy, a passenger in Hosey's vehicle, told Hosey they should get a pistol. Lugen thought McCoy was just "basically fronting," or acting tough. Lugen never knew Hosey to carry a gun. Lugen testified McCoy and Hosey left to get Hosey's pit bull.

Around 11:00 p.m. or midnight, Lugen was in front of El Cristal, a bar located at The Cut. Lugen and Smith were attempting to break into cars on Harry Hines Boulevard, intending to sell what they stole for money or crack cocaine. Hosey and his dog came around the corner at The Cut where Lugen was "playing lookout" while Smith broke into cars. Lugen told Hosey that he was "hitting a lick," meaning he was in the process of committing crime in order to buy drugs from Hosey. Lugen told Hosey, "Look man, you don't even supposed to be here right now. The man is looking for you with a pistol." Hosey told Lugen that after Lugen finished breaking into cars, Hosey had drugs to supply him.

Lugen testified Hubert came around the corner. He walked up to Lugen and pointed the gun at him and said, "I ought to shoot you" for warning Hosey. Lugen told Hubert, "If you are going to shoot, shoot. Other than that, get the gun out of my face." Hosey was sitting on a concrete parking barrier, and Hubert turned and pointed the gun in Hosey's face. Hosey hesitated for a second, leaped up, grabbed Hubert around his midsection, and reached for the gun. At that point, they were struggling while standing. Hubert was trying to get into a position to hit Hosey on the side of the head with the gun. Hubert slammed Hosey to the ground. Hubert remained standing while Hosey, lying flat on the ground, wrapped his arms around Hubert's ankles. Hosey's dog was trying to attack Hubert. Hubert was slinging the gun at the dog, and the dog, trying to avoid being hit by the gun, was jumping back and forth over Hosey. Lugen told Hubert to put the gun down.

According to Lugen, Smith heard the yelling. Smith came across Harry Hines Boulevard to The Cut, grabbed the dog and pulled him back, and told Hubert to put the gun down. Lugen and Smith told Hubert to "square up and flight [Hosey] like a real man" and to let Hosey get up.

Hosey was still on the ground holding on to Hubert's ankles, and Hubert was trying to pull his leg up and out of Hosey's grip. Lugen testified that Hubert leaned back and shot Hosey in the back. During the struggle, Hubert was not on the ground, and Lugen does not know how injuries to Hubert's knees, elbows, and hands were sustained. Lugen testified that it was not an accident that Hubert pulled the trigger of the gun. After shooting Hosey, Hubert told Lugen, "That could have been you."

Lugen yelled for Smith to call 9-1-1. While Smith went to call 9-1-1, Lugen stayed with Hosey. Hosey had in his possession crack cocaine valued at about fifty dollars, money, keys to his car, and his cell phone. Lugen took the crack cocaine, because he did not want it to be found in Hosey's possession. Later, Lugen smoked the crack cocaine he took from Hosey's pocket.

The police took Lugen to the police station. Lugen acknowledged his testimony at trial did not match what he had told the police when taken to the station. There, Lugen told the police he did not know anything about the cell phone. Although he actually did know about the cell phone at the time, he did not want to bring up "all the other stuff." Lugen told the police that Smith and McCoy were trying to take Hosey's wallet. Lugen indicated he did not know whether Hubert was trying to shoot Hosey. Lugen also told the police he did not believe Hubert shot Hosey intentionally, but later changed his view when he thought about Hubert saying the victim "could have been" Lugen.

McCoy testified at trial. McCoy was serving a jail sentence at the time of trial. He had criminal convictions for aggravated robbery, aggravated robbery with a deadly weapon, and two convictions for possession of a controlled substance.

McCoy had known Hubert from "the street" since 2006. He had known Hosey for about a year before the shooting. McCoy and Hosey would "hustle the block" selling crack cocaine. McCoy had never seen Hosey use crack cocaine. At the time of the shooting, McCoy knew Lugen from "the street," but he had not known him for long. McCoy also knew Smith from "the street," but he did not like Smith because he felt "he was a snake" and was "always up to something shady."

McCoy had heard about the cell phone. Hosey told him the matter was over "thirty-five dollars of crack." According to McCoy's testimony, Smith owed Hubert twenty-five dollars. Hosey was to have given Smith twenty-five dollars that Smith would then give to Hubert. Instead, Hosey gave Smith some crack cocaine, which Smith smoked.

On the night of October 3, 2011, Hosey picked up McCoy. They went to "reup," meaning "score some crack to sell." Hosey received a phone call from Hubert. McCoy grabbed the phone from Hosey. Hubert said Hosey owed him some money. McCoy told Hubert he needed to be "addressing" Smith, because Smith was the one with the cell phone. McCoy gave Hosey back his cell phone, and Hosey hung up the phone. Later, Hubert called back again. According to McCoy, Hubert was not being aggressive on the phone.

After speaking with Hubert on the phone, Hosey felt he needed a gun and asked if McCoy knew where they could get a gun. They went to McCoy's aunt's house to get a gun, but she would not give a gun to McCoy.

Hosey and McCoy returned to The Cut. Hosey's pit bull was with them. The pit bull slept in Hosey's car and had been with them all day. McCoy testified that if anyone "messed with" Hosey, Hosey's girlfriend, or McCoy, the dog would help defend them. When they arrived at The Cut, Hubert was not there. Lugen was outside stealing "Cadillac converters" with Smith. Lugen told Hosey and McCoy that Hubert was looking for Hosey and that Hubert had a

pistol. McCoy testified that both he and Hosey had each bought four grams of crack cocaine when they went to "reup," and before the shooting, McCoy had sold crack cocaine for about sixty dollars. Neither McCoy, Hosey, nor Lugen had a gun with them that night, and they did not intend to rob Hubert.

Fifteen to twenty minutes later, Hubert arrived and Alexander was with him. McCoy thought he could intervene. He went to the "back" where Hubert was speaking with a group of Hispanic males in a mechanic shop. McCoy saw Hubert loading the gun with bullets while Hubert was speaking with the men. McCoy told Hubert, "don't go around" to the front of the building, "just chill." According to McCoy, Hubert said, "I want my money. All I want is my money, then I am gone. I ain't tripping." A portion of McCoy's interview by the police after the shooting was played for the jury. McCoy, who was alone in the room, said aloud, "Don't go back there, they are going to rob you." He testified at trial that when he said that, he was talking to himself about how he felt the "situation at hand . . . had played out." He testified he was not describing a conversation he had with Hubert.

According to McCoy, Hubert walked to the front of the buildings. Initially McCoy testified Hubert did not say anything to Lugen. However, he then testified Hubert told Lugen, "I ought to kill you for snitching." Hubert then asked Hosey where his money was. Hosey told Hubert he did not owe him any money. Hosey was sitting down and Hubert was standing over him. Hubert had his gun in his hand. Hubert and Hosey began to struggle over the gun. The pit bull tried to jump on Hubert. Hosey fell, and when he did, he grabbed Hubert around his waist. Hubert was trying to keep from being bitten by the dog. When Hubert fired the gun, Hosey was holding Hubert's ankles. Hubert was trying to step out of Hosey's grasp and dodge the dog at the same time. According to McCoy, Hubert was trying to step over Hosey to keep from falling when the gun went off. After the gun fired, Hubert did not threaten anyone else. He walked

away. To McCoy, Hubert appeared surprised to have shot Hosey. McCoy testified he felt Hubert was not really trying to shoot Hosey. Smith and Lugen went through Hosey's pockets and got Hosey's drugs and money. They did not take Hosey's wallet, which also had some money in it. McCoy remained with Hosey, and later went to the hospital with him.

McCoy spoke to the police that evening and again a day or two later. McCoy indicated he told the police that Hubert told Lugen prior to the shooting that "I ought to kill you for snitching." McCoy also told the police that Hubert shot Hosey. McCoy testified that he did not tell the police that he thought the shooting was an accident.

Detective Scott Sayers of the Homicide Unit of the Dallas Police Department testified. Sayers interviewed Hubert on October 13, 2011, and the videotape of that police interview was played for the jury. After Hubert was interviewed, he was booked into jail and placed under arrest for murder.

Sayers testified that Hubert went to The Cut with a gun. In Hubert's police interview, Hubert never mentioned anyone else having a gun. Hubert said he went to The Cut and McCoy told him, "They are going to rob you." Hubert initially told Sayers that McCoy had given him the gun, but later acknowledged he had purchased the gun sometime prior to the incident. In the interview, Hubert told Sayers that he put the gun in Lugen's face and told Lugen he was wrong "to set me up." According to what he told Sayers in the interview, Hubert then demanded his twenty-five dollars from Hosey. Hubert stated Hosey slammed him to the ground twice, and twice Hubert was able to get back to a standing position. Hubert said after he got up the second time and while Hosey was on the ground, Hosey tried to grab him, and that was when he shot him. Hubert said he shot Hosey because Hosey kept charging him. Hubert stated he dropped the gun and left. Hubert told Sayers that he knew Hosey was trying to rob him when Hosey tried to reach into Hubert's pockets while they were struggling and because, when he got back to

Alexander's car after shooting Hosey, he learned Alexander had been attacked by two men who tried to rob her at the same time. Hubert told Sayers that "they deserved what they got," and "I was getting my twenty-five dollars."

Sayers testified Hubert never said in the interview that the gun discharged accidentally or that he did not mean to shoot Hosey. Hubert told Sayers that when he confronted Hosey with the gun, Hosey tried to tackle him. In describing how Hosey grabbed him and threw him to the ground, Hubert showed Sayers the scars on his legs where he had been injured. Sayers believed there was a struggle. It appeared to Sayers that during the struggle, Hubert had been knocked to the ground such that his legs were skinned and left visible scars nine days later.

Sayers testified that in the interview, Hubert tried to make it seem he was just going to The Cut to make it "all right with his friends" and found out they were trying to rob him. By the end of the interview, it became apparent to Sayers that Hubert wanted to get his twenty-five dollars for the cell phone. After talking to Hubert, it appeared to Sayers that Hubert went into that situation with a loaded handgun when no one else had a gun, and Hubert could have left the scene but did not.

The jury found Hubert guilty of murder as charged by indictment. The jury then assessed punishment.

At the punishment phase of the trial, Willie Washington of the Dallas County Sheriff's Department testified regarding records of Hubert's prior convictions. Hubert had been previously convicted of possession of cocaine, convicted three times of burglary of a building, and convicted of driving while his license had been suspended.

Hubert's stepfather, Marvin Foots, testified at the punishment phase of the trial. He stated that Hubert and Alexander came to his apartment the night of the shooting. Foots saw

scars and Hubert said he had been in a scuffle. Hubert did not tell Foots he had murdered anyone.

Hubert testified in the punishment phase of trial. Hubert was thirty-nine years old at the time of trial. He had completed an eleventh grade education. He had been convicted of the prior criminal offenses of possession of cocaine, robbery, three burglaries, and driving while his license was suspended.

Hubert testified he did not intentionally take the life of Hosey. According to Hubert, when he drove in the alley of The Cut, McCoy told him "they were going to rob me." Hubert carried a gun, and he did not believe "they" knew he had a gun. Hubert testified the gun went off because he and Hosey were struggling and Hosey's dog was in the way. When asked why he did not walk away from the situation before the shooting, he said he was not thinking. Hubert testified he did not feel he did anything wrong. He stated "they" did wrong, and he "was defending his life, too."

Hubert pleaded true to the enhancement paragraph of the indictment. The jury assessed punishment of forty-five years' imprisonment. Hubert filed this appeal.

## Questions Regarding Criminal History

In his first two points of error, Hubert asserts he is entitled to a new trial on punishment because the trial court erred in denying his motion for mistrial when the State, "through want of due diligence," mistakenly indicated Hubert had been previously convicted of aggravated robbery and a drug trafficking offense.

### Background

During the punishment phase of the trial, the State began questioning Hubert regarding items listed on the notice of extraneous offenses the State filed prior to trial. The State's notice listed two offenses in 1990 and fifteen offenses between 1997 and 2006. The first two items on

–12–

the notice were a 1990 "transport/sale narcotics" offense in Los Angeles, California, and a 1990 aggravated robbery with a deadly weapon offense in Dallas County, Texas. The State asked Hubert the following two questions regarding the 1990 offenses listed on the notice of extraneous offenses:

The State:   Mr. Hubert, in 1990 you were convicted of transporting, selling narcotics in Los Angeles [sic] California; isn't that right?
Hubert:      I was a kid then.
The State:   Okay. In 1990, you were convicted of aggravated robbery with a deadly weapon in Dallas County?
Hubert:      I was not convicted.

Hubert's counsel then asked to approach the bench, and a discussion ensued outside the presence of the jury. Hubert's counsel objected to the State questioning Hubert regarding aggravated robbery and drug trafficking convictions because it was improper and the State had failed to exercise due diligence in ascertaining whether those matters resulted in convictions. Hubert's counsel argued that if the State could not justify in good faith their allegations, Hubert was entitled to a mistrial. Hubert's counsel orally requested the trial court make findings of fact and conclusions of law regarding whether the State had a good-faith belief after exercising due diligence that Hubert had been convicted of drug trafficking and aggravated robbery in 1990. The trial court inquired of the State concerning its basis for asking those questions. The State advised the trial court that it had relied on National Crime Information Center (NCIC) information in filing the notice of extraneous offenses. The State advised the trial court that it had initially believed Hubert had been convicted in 1990 of drug trafficking and aggravated robbery, but acknowledged that it had made a mistake and had misspoken with regard to whether Hubert had been convicted in those cases.

After the discussion outside the presence of the jury, the trial court instructed the jury "to disregard the questions asked by the State with respect to the delivery charge occurring in Los Angeles and the question regarding the aggravated robbery offense." Hubert's counsel objected

–13–

that the instruction was inadequate to overcome prejudice and harm to Hubert and moved for a mistrial, which the trial court denied.

*Standard of Review*

We review a trial court's denial of a mistrial under an abuse of discretion standard. *See Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *Dooley v. State*, 65 S.W.3d 840, 841 (Tex. App.—Dallas 2002, pet. ref'd). Mistrial is appropriate only for "highly prejudicial and incurable errors." *Simpson*, 119 S.W.3d at 272 (citing *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Granting a mistrial is appropriate when error is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.*; *see also Simpson*, 119 S.W.3d at 272.

Our review of "[w]hether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis. *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007) (quoting *Hawkins v. State*, 135 S.W.3d at 77). We balance three factors: (1) the severity of the misconduct, (2) curative measures employed by the trial court, and (3) certainty of the punishment assessed. *See Archie*, 221 S.W.3d at 700; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). In balancing these factors, we examine the particular facts and circumstances of the case. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); *Hernandez v. State*, 805 S.W.2d 409, 414 (Tex. Crim. App. 1990). "The asking of an improper question will seldom call for a mistrial, because, in most cases, any harm can be cured by an instruction to disregard." *Wood*, 18 S.W.3d at 648 (quoting *Ladd*, 3 S.W.3d at 567). When a trial court instructs the jury to disregard an improper comment or question, we presume the jury will follow the court's instruction unless the remark or comment was so prejudicial or extreme that the instruction was incapable of removing the harm. *Gardner v. State*, 730 S.W.2d

–14–

675, 696 (Tex. Crim. App. 1987); *see also Wood*, 18 S.W.3d at 648 ("A mistrial is required only when the improper question is clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors.") (quoting *Ladd*, 3 S.W.3d at 567). A prompt instruction to disregard will ordinarily cure any prejudice associated with an improper question and answer, even one regarding extraneous offenses. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *see also Marshall v. State*, 210 S.W.3d 618, 628–29 (Tex. Crim. App. 2006).

*Analysis*

On appeal, the State acknowledges the question regarding a 1990 conviction of aggravated robbery was improper, noting Hubert was charged with aggravated robbery with a deadly weapon in 1990, but the Grand Jury returned a "no-bill" and Hubert therefore was neither indicted nor convicted. The State further acknowledges the question regarding a 1990 conviction for transporting or selling narcotics was also improper. According to the State, Hubert's response that he "was a kid then" and the evidence regarding Hubert's birthdate "show" Hubert would have been seventeen years of age at the time of the 1990 California proceedings and, because he was under the age of eighteen, those proceedings would have been in juvenile court and could not have resulted in a "conviction." *See* CAL. WEL. & INST. CODE § 602(a) (2002) ("Except [for murder and certain sex offenses], any person who is under the age of 18 years when he or she violates any law of this state . . . is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court. . . ."). However, the State asserts the trial court's instruction to the jury to disregard the questions was effective to cure any prejudice, and a mistrial was not warranted.

Prior to trial, the State provided Hubert with notice pursuant to article 37.07, section 3(g) of the code of criminal procedure of its intent to introduce extraneous offenses, including the

–15–

aggravated assault and drug-trafficking matters that are at issue here. The problem with the questions posed to Hubert by the State was that they referred to a conviction in connection with each of the 1990 "extraneous offenses." Following Hubert's objection, the State promptly informed the trial judge it had misspoken in referring to these matters as convictions. The State did not return to the subject matter after Hubert objected, and did not mention the 1990 cases in its punishment phase closing argument. We conclude the prosecutor's misstatement imbedded in the two questions did not constitute flagrant misconduct. *See Archie*, 221 S.W.3d at 700.

The trial court promptly instructed the jury to disregard the two questions posed to Hubert by the State. The trial court stated to the jury, "[Y]ou are instructed to disregard the questions asked by the State with respect to the delivery charge occurring in Los Angeles, and the question regarding the aggravated robbery offense." The curative instruction provided by the trial judge to the jury was clear, direct, and appropriate. *See id.*

The jury had already convicted Hubert of murder. During the punishment phase, the jury heard evidence that Hubert had been previously convicted of possession of cocaine, robbery, three burglaries, and driving with a suspended license. The jury heard evidence that Hubert stated "they" got what they deserved, as well as Hubert's testimony that he did not feel he had done anything wrong. Hubert had pleaded true to the enhancement paragraph of the indictment, and the range of punishment was fifteen years to ninety-nine years or life imprisonment. *See* TEX. PENAL CODE ANN. § 12.42(c)(1) (West Supp. 2013). Despite the State's argument that the jury assess punishment at "the top" of the punishment range, the jury assessed punishment of forty-five years' imprisonment, less than half of a ninety-nine year sentence the jury could have imposed and closer to a punishment of fifteen years' imprisonment for which Hubert's counsel argued. After reviewing the record, we conclude that due to the strength of the State's

–16–

punishment case, it is likely the same punishment would have been assessed regardless of the two improper questions at issue. *See Archie*, 221 S.W.3d at 700.

*Conclusion*

We agree the two questions posed by the State to Hubert concerning the 1990 "extraneous offenses" were improper. Nevertheless, we cannot conclude the questioning Hubert complains of was so clearly calculated to inflame the minds of the jury or of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind or rendered ineffective the trial court's instruction to disregard. *See Moore v. State*, 999 S.W.2d 385, 406 (Tex. Crim. App. 1999); *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). We conclude there was a reasonable basis for the trial court to believe its instruction to disregard was effective and cured any prejudicial effect the State's questions would have had. Accordingly, the trial court did not abuse its discretion in denying Hubert's motion for mistrial, and we resolve Hubert's first and second points of error against him.

**Cumulative Error**

In his third point of error, Hubert asserts the trial court erred in denying his motion for a mistrial, and he is entitled to a new trial on punishment because of the "combined and cumulative impact" from the State's "improper statements" that Hubert had been convicted of aggravated robbery and drug trafficking in 1990. We cannot agree.

Hubert approaches this issue as one of cumulative harm resulting from the State's two questions concerning the 1990 "extraneous offenses." In support of his argument, Hubert cites *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999), for the proposition that a number of errors may be found harmful in their cumulative effect. However, "a harm analysis is employed only when there is error, and ordinarily, error occurs only when the trial court makes a mistake." *Archie*, 221 S.W.3d at 669 (quoting *Hawkins*, 135 S.W.3d at 76–77). Here, the trial

–17–

court responded to the objection of the defense by instructing the jury to disregard the State's questions concerning the 1990 drug trafficking and aggravated robbery cases. "The only adverse ruling—and thus the only occasion for making a mistake—was the trial court's denial of the motion for mistrial. Under those circumstances, the proper issue is whether the refusal to grant the mistrial was an abuse of discretion." *Id*. We have already resolved that issue against Hubert. Accordingly, we also resolve Hubert's third point of error against him.

### Findings of Fact and Conclusions of Law

In his fourth point of error, Hubert asserts he is entitled to findings of fact and conclusions of law, and he requests leave to revise his appellate points of error and argument concerning the due diligence exercised by the State in ascertaining a basis for its questions to Hubert regarding the 1990 drug trafficking and aggravated assault cases. Hubert requests that, if his first three points of error are resolved against him "on the basis of the existing record," this Court abate this appeal in order for the trial court to make findings of fact and conclusions of law regarding the information available to the State when it questioned Hubert regarding the 1990 cases and the information that subsequently became available to demonstrate that the State was incorrect concerning a basis for its questions.

As discussed above, the State acknowledges it was mistaken and "misspoke" when questioning Hubert with regard to the 1990 cases. The trial court questioned the State regarding how it had obtained information regarding the 1990 cases prior to its curative instruction to the jury. While we question whether abatement of this appeal in order for the trial court to make findings of fact and conclusions of law as requested by Hubert is proper, we need not address that issue. Our resolution of Hubert's first three points of error was not dependent upon evidence relating to "the mental state of the prosecutor" or whether the State "consciously disregarded any pertinent information." Accordingly, we resolve Hubert's fourth point of error against him.

## Jury Charge

In his fifth point of error, Hubert asserts the trial court erred by instructing the jury in the punishment charge that he could receive good conduct credits prior to serving one-half of his sentence. Hubert argues the trial court's punishment jury charge egregiously harmed him "because the jury rendered a 45-year sentence based on its misinformed belief about the existence [of] law providing for good conduct time." Hubert argues the erroneous instruction "made the case for punishment clearly and significantly more persuasive," because the parole eligibility instruction gave the jury the misleading impression that good conduct credit could result in Hubert becoming eligible for parole in less time than actually permitted by law. The State acknowledges the instruction was incorrect and internally inconsistent, with the phrases "plus any good conduct time earned" and "without any consideration of good conduct time" contradicting one another. However, the State asserts Hubert was not egregiously harmed by the erroneous instruction.

During the punishment phase of the trial, the trial court gave the following parole eligibility instruction:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served *plus any good conduct time earned* equals one-half of the sentenced imposed or thirty (30) years, whichever is less, without any consideration of good conduct time. Eligibility for parole does not guarantee that parole will be granted.

(Emphasis added.). The italicized language in the trial court's jury charge is incorrect because the jury had previously found Hubert guilty of murder, and a person convicted of murder may not count good conduct time toward parole eligibility. The following language should have been made a part of the jury's charge on punishment in lieu of the language quoted previously in this paragraph:

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual

–19–

time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time the defendant may earn. . . . Eligibility for parole does not guarantee that parole will be granted.

TEX. CODE CRIM. PROC. ANN. art. 37.07 § 4(a) (West Supp. 2013); *see also* TEX. GOV'T CODE ANN. § 508.145(d)(1) (West Supp. 2013) (inmate serving a sentence for murder "is not eligible for release on parole until the inmate's actual calendar time served, without consideration of good conduct time, equals one-half of the sentence or 30 calendar years, whichever is less").

We agree that the parole eligibility instruction given by the trial court was erroneous since it did not comply with article 37.07, section 4(a), of the code of criminal procedure. A defendant convicted of murder in Texas is not permitted to count any earned "good conduct time" toward parole eligibility. *See* TEX. GOV'T CODE ANN. § 508.145(d)(1). To the extent the trial court's instruction suggests differently and is not the proper, statutorily required charge, the instruction is a misstatement of the applicable law. In addition, the trial court's use of the phrase "plus any good conduct time earned" is internally inconsistent with the subsequent phrase of the jury charge "without any consideration of good conduct time," which modifies the explanation of parole eligibility contained in article 37.07, section 4(a).

Hubert did not object to the erroneous jury charge. Accordingly, we reverse only if the error was so egregious and created such harm that it denied Hubert a fair and impartial trial. *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). Any harm that was inflicted by the erroneous charge must be "assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984); *see Ngo*, 175 S.W.3d 738, 750 n.48 (Tex. Crim. App. 2005). The degree of harm demonstrated by the appellant must be actual, not merely theoretical. *Almanza*, 686 S.W.2d at 174. "Jury-charge error is egregiously harmful if it affects

the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). Egregious harm is a difficult standard to meet and must be determined on a case-by-case basis. *See Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002).

Here, a number of factors mitigate against a finding of egregious harm. First, the jury's assessment of punishment was less than the maximum allowed under the law. *See Shavers v. State*, 985 S.W.2d 284, 292 (Tex. App.—Beaumont 1999, pet. ref'd). The jury assessed punishment of forty-five years' imprisonment, when the range of punishment available was fifteen years to ninety-nine years or life imprisonment. *See* TEX. PENAL CODE ANN. § 12.42(c)(1).

Second, in addition to the erroneous parole eligibility instruction, the jury was provided in the punishment phase the statutory instructions explaining good conduct time and parole:

> Under the law applicable to this case, the defendant, if sentenced to a term of imprisonment, may earn time off the sentence[1] imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.
>
> It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

*See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a). The jury was also given mitigating or curative instructions in the paragraphs following the instruction containing the erroneous language:

---

[1] The instruction contained in section 4(a) of article 37.07 refers to "the period of incarceration," rather than "the sentence." *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 4(a).

–21–

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

In determining the punishment in this case, you are not to discuss among yourselves how long the Defendant will be required to serve any sentence you decide to impose. Such matters come with [sic] the exclusive jurisdiction of the Board of Pardons and Paroles of the State of Texas, and are no concern of yours.

*See id.*; *Ross v. State*, 133 S.W.3d 618, 624 (Tex. Crim. App. 2004); *see also Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006).

The trial court's parole instructions informed the jury that Hubert may be released from a prison sentence early because of good conduct time or parole, but that one cannot predict how parole law and the award of good conduct time may be applied to him. Further, the jury was explicitly instructed that although it could consider the existence of parole law and good conduct time, it could not consider the manner in which parole law or the award of good conduct time may be applied to Hubert specifically. *See Igo*, 210 S.W.3d at 647.[2] Absent evidence to the contrary, we presume jurors understood and followed the court's instructions in the jury charge. *See Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011). The jury charge contained the specific statutory admonition that they were not to consider the extent to which good conduct time may be awarded to or forfeited by Hubert or to consider the manner in which the parole law may be applied to Hubert. "Nothing in the record suggests that the jury discussed, considered or tried to apply (despite the judicial admonition *not* to apply) what they were told about good conduct time and parole." *Ross*, 133 S.W.3d at 624 (quoting *Luquis v. State*, 72 S.W.3d 355, 367 (Tex. Crim. App. 2002)). The jury did not send out any notes or questions expressing confusion

---

[2] *See Ortega v. State*, No. 03-11-00546-CR, 2012 WL 5974094, at *3 (Tex. App.—Austin Apr. 17, 2013, pet. ref'd) (mem. op., not designated for publication).

about the parole instruction or indicating the possible application of good conduct time or the parole law to Hubert.  *See id.*[3]

During closing argument, neither party referenced the erroneous instruction that, while internally inconsistent, suggested in part that good conduct time could affect Hubert's parole eligibility.  Instead, the State focused on requesting the jury to consider punishment "at the top" of the punishment range, meaning life imprisonment.  Conversely, Hubert's counsel argued the jury should consider the minimum sentence of fifteen years' imprisonment.  We further note that during voir dire, Hubert's counsel prevailed on the trial court to allow him to address punishment and parole eligibility, and he accurately advised the venire panel:

> I'm gonna talk to you because one of the instructions that you would get to in the area . . . when you get to the punishment . . . [b]ecause you're gone [sic] get a charge that tells you that a person will be required to serve 50 percent of whatever sentence you give them before they would ever become eligible for parole.  Okay?  It will go on to tell you that the decision as to whether or not that person makes parole—50 percent just means it would be eligible to be considered, doesn't mean that he's gonna get it.  It tells you that, that decision will be made by somebody else at a later time, has nothing to do with the personnel in the court involved in this case, and it will tell you in the next paragraph that you cannot consider for any purpose, whatsoever, what you were just told about in the preceding paragraphs.  The charge will tell you that you're not allowed to use that information to try to go back and try to multiply or add and subtract and do all that ciphering where you go back there and try to guess for yourself how long the person would do on the sentence that you assess. . . .  As the Court's instructions tell you, the decision whether or not someone ever makes parole is made by somebody down the road years later.  You don't go back there and say well, since he'll be eligible in ten years, we'll give him 20 because we know he can get out in ten.  You don't do that.  The jury should assess only the sentence that you think is appropriate, and then you allow the people in that agency to determine how much he would actually serve.  Does everybody understand that?

Finally, the evidence relating to guilt-innocence and punishment was strong.  The record provides a basis for the jury's assessment of punishment without suggesting harm from the erroneous charge.  The evidence established Hubert was upset that neither Smith nor Hosey had

---

[3] *See Powell v. State*, No. 05-12-01158-CR, 2013 WL 3951621, at *3 (Tex. App.—Dallas Aug. 1, 2013, no pet.) (mem. op., not designated for publication).

paid Alexander for the cell phone sold to Smith. The day of the shooting, Hubert went to The Cut several times and was seen by Lugen in possession of a gun and looking for Hosey, which prompted Lugen to warn Hosey that Hubert was looking for him and had a gun. When Hubert came to The Cut the night of the shooting, he left Alexander's car carrying his .357 Magnum handgun and McCoy saw Hubert loading the gun prior to encountering Hosey. The evidence was undisputed that no one else Hubert encountered that night was carrying a gun. When Hubert encountered Lugen, he put his gun in Lugen's face and told him he should shoot Lugen for "snitching" to Hosey. Hubert then put his gun in Hosey's face. There is no evidence Hosey was reaching for the gun or had his hands on the gun at the time Hubert fired it. Rather, the evidence showed that, after struggling with Hosey and while Hosey was face-down on the ground, Hubert stepped or leaned backward in the process of freeing himself from Hosey's grip on his ankles and fired the gun into Hosey's back. Lugen testified he believed the shooting was intentional, particularly given that, as Hubert left the scene, he told Lugen "That could have been you." Hubert did not tell the police the shooting was an accident. Hubert told the police when he was interviewed a number of days after the offense that "they got what they deserved," and he wanted to get his money. Indeed, at the punishment phase of the trial Hubert said he did not feel he had done anything wrong. Although Hubert told the police "they" intended to rob him that night, Hubert made no explanation for coming to The Cut armed when he was looking for Hosey. With regard to his criminal history, Hubert had been previously convicted of possession of cocaine, robbery, three burglaries, and driving while his license was suspended.

The factors discussed above mitigate against a finding of egregious harm. Hubert did not receive the maximum sentence available. The jury charge contained curative or mitigating instructions. The parole instruction explained the possibility, not certainty, that Hubert's prison sentence may be reduced by good conduct time or parole eligibility and, further, clearly

admonished the jury not to consider the extent to which the parole law or good conduct time might be applied to him. No reference to good conduct time or parole eligibility was mentioned by either party during punishment phase arguments. There is no evidence in the record that the jury attempted to apply parole law or good conduct time when assessing Hubert's sentence.

Under the standards necessary to show egregious harm, we conclude that the erroneous parole eligibility instruction did not deprive Hubert of a fair and impartial trial or affect the very basis of the case, deprive him of a valuable right, or vitally affect a defensive theory. *See Stuhler*, 218 S.W.3d at 719. Based on our review of the entirety of the record, we conclude that egregious harm has not been shown, and we resolve Hubert's fifth point of error against him.

### Evidence of Intent

In his sixth point of error, Hubert asserts the evidence was insufficient to establish he intentionally shot Hosey. According to Hubert, the evidence established he "acted recklessly or at most showed a mere modicum of proof on the element of intent." The State responds that the evidence was sufficient to prove Hubert acted intentionally, and, even if the evidence was insufficient to prove he acted intentionally, Hubert would not be entitled to reversal of his conviction because the evidence was sufficient to prove he acted knowingly.

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The jury,

–25–

as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Jackson*, 443 U.S. at 318–19; *Brooks v. State*, 323 S.W.3d 893, 899–900 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").

> Hubert was indicted for murder under penal code sections 19.02(b)(1) and (2) as follows:
>
> [Hubert] did unlawfully then and there intentionally and knowingly cause the death of NICHOLAS HOSEY, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, a deadly weapon.
>
> And further did unlawfully then and there intend to cause serious bodily injury to NICHOLAS HOSEY and did then and there commit an act clearly dangerous to human life, to-wit: by SHOOTING THE DECEASED WITH A FIREARM, a deadly weapon, and did thereby cause the death of NICHOLAS HOSEY, an individual.

In the guilt-innocence phase jury charge, the jury was instructed to find Hubert guilty of murder as charged in the indictment if the jury found Hubert knowingly or intentionally caused Hosey's death or if Hubert intended to cause serious bodily injury and committed an act clearly dangerous to human life by shooting Hosey with a firearm, a deadly weapon. The jury found Hubert guilty of murder as charged in the indictment.

"A person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Murder is a "result of conduct" offense. *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994). "That is, the accused must have intended the result, death, or have been aware that his conduct was reasonably certain to cause that result." *Guzman v. State*, 20 S.W.3d 237, 240 (Tex. App.—Dallas 2000), *rev'd on other grounds*, 85

S.W.3d 242 (Tex. Crim. App. 2002). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b).

The specific intent to kill may be inferred from the use of a deadly weapon, unless the manner of its use makes it reasonably apparent that death or serious bodily injury could not have resulted. *Flanagan v. State*, 675 S.W.2d 734, 741 (Tex. Crim. App. 1984) (op. on reh'g); *see also* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (West Supp. 2013) ("deadly weapon" means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury). "Naturally, the most obvious cases and the easiest ones in which to prove a specific intent to kill, are those cases in which a firearm was used and was fired or attempted to have been fired at a person." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986). If a deadly weapon, such as a pistol, is used in a deadly manner, an intent to kill is presumed. *Livingston v. State*, 739 S.W.2d 311, 337 (Tex. Crim. App. 1987); *see also Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981) ("In fact, where a deadly weapon is fired at close range and death results the law presumes an intent to kill."). A pistol is a weapon deadly per se when fired at a victim at close range. *Thompson v. State*, 521 S.W.2d 621, 622 (Tex. Crim. App. 1974). The jury may also infer the intent to kill from the defendant's words or conduct, *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967), and from any evidence it believes proves the existence of that intent. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003).

With these principles in mind, we turn to the record to determine whether the evidence is sufficient to establish that Hubert intentionally or knowingly caused Hosey's death. The record is clear that Hubert shot Hosey at close range. Hubert was standing over Hosey as he lay prone on

the ground. The jury could infer Hubert's intent to kill based on this evidence. *See Godsey*, 719 S.W.2d at 583; *see also Thompson*, 521 S.W.2d at 622.

The jury could have also inferred Hubert's intentionally or knowingly caused Hosey's death from Hubert's words and conduct. *See Hall*, 418 S.W.2d at 812. The evidence established Hubert was upset that Smith or Hosey had not paid Alexander for the cell phone she found. The day of the shooting, Hubert went to The Cut several times with a gun and looking for Hosey, which prompted Lugen to warn Hosey that Hubert was looking for him and had a gun. When Hubert came to The Cut the night of the shooting, he left Alexander's car carrying his .357 Magnum handgun and McCoy saw Hubert loading the gun prior to encountering Hosey. The evidence was undisputed that no one else Hubert encountered that night was carrying a gun. When Hubert encountered Lugen, he put his gun in Lugen's face and told him he should shoot Lugen for "snitching" to Hosey. Hubert then put his gun in Hosey's face. There is no evidence Hosey was reaching for the gun or had his hands on the gun at the time Hubert fired it. Rather, the evidence showed that, after struggling with Hosey and while Hosey was face-down on the ground, Hubert stepped or leaned backward in the process of freeing himself from Hosey's grip on his ankles and fired the gun into Hosey's back. Lugen testified he believed the shooting was intentional, particularly given that, as Hubert left the scene, he told Lugen "That could have been you." Hubert did not tell the police the shooting was an accident. Hubert told the police when he was interviewed a number of days after the offense that "they got what they deserved," and he wanted to get his money.

In his brief, Hubert argues he "had ample opportunity to shoot more than once, and he chose not to, even knowing that the deceased survived the solo shot." This reasoning in support of his claim that the evidence is insufficient to establish he intentionally or knowingly caused Hosey's death is flawed. "The fact that appellant fired the gun only once and that the

complainant sustained a single wound does not establish a lack of intent to kill." *Ayala v. State*, 267 S.W.3d 428, 433 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

The fact finder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *See Chambers*, 805 S.W.2d at 461. We defer to the jury's determination of witness credibility. *Brooks*, 323 S.W.3d at 899. After reviewing the evidence under the appropriate standard, we conclude a rational trier of fact could have found beyond a reasonable doubt that Hubert intended to kill Hosey or that Hubert knowingly caused Hosey's death, and the evidence is sufficient to support Hubert's conviction for murder. We resolve Hubert's sixth point of error against him.

## Conclusion

Having resolved Hubert's points of error against him, we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
Tex. R. App. P. 47

121084F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANDRE DJUNA HUBERT, Appellant

No. 05-12-01084-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 194th Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. F11-60671-M.
Opinion delivered by Justice Fillmore,
Justices Bridges and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 4th day of March, 2014.

/Robert M. Fillmore/

ROBERT M. FILLMORE
JUSTICE